UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RICHARD W. MONFETTE, | ) | CASE NO. 3:15CV2683 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | GEORGE J. LIMBERT |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | MEMORANDUM OPINION |
| SECURITY ADMINISTRATION, | ) | AND ORDER |
| | ) | |
| Defendant. | ) | |

Plaintiff Richard W. Monfette ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  ECF Dkt. #1.  In his brief on the merits, filed on April 1, 2016, Plaintiff asserts that the ALJ erred because she: (1) did not provide good reasons for rejecting the most severe impairments contained in the opinion offered by one physician; and (2) failed to develop the record with respect to Plaintiff's intellectual impairments.  ECF Dkt. #16 at 6-16.  On June 13, 2016, Defendant filed a response brief.  ECF Dkt. #19.  Plaintiff did not file a reply brief.

For the following reasons, the Court AFFIRMS the decision of the ALJ and dismisses the instant case in its entirety with prejudice.

## I.  FACTUAL AND PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on May 31, 2012.  ECF Dkt. #13 ("Tr.") at 17.[2] In both applications, Plaintiff alleged disability beginning October 26, 2011.  *Id.*  These claims were

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than the page numbers assigned when the Transcript was compiled.  This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

denied initially and upon reconsideration on August 1, 2012, and October 12, 2012, respectively. *Id.* Plaintiff then requested a hearing before an ALJ, and the hearing was held on May 20, 2014. *Id.* On June 5, 2014, the ALJ denied Plaintiff's applications for DIB and SSI. Tr. at 17. As an initial matter, the ALJ stated that Plaintiff had previously filed applications for DIB and SSI, and that a decision was issued by a different ALJ on December 27, 2011. *Id.* Accordingly, the ALJ noted that the period under consideration for purposes of her review began on December 28, 2011, since Plaintiff had not submitted evidence that warranted a change in the previous ALJ's decision. *Id.* at 17-18. In addition, the ALJ also stated that she must adopt the prior restrictions assessed by the ALJ unless new and material evidence: showed that there had been a change in Plaintiff's condition; or supported an alternate conclusion. *Id.* at 18. The ALJ determined that new evidence indicated that there had been a change in the severity of Plaintiff's medically determinable impairments that resulted in a finding different from the prior assessed residual functional capacity ("RFC"). *Id.*

Next, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2015. *Id.* at 20. Continuing, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 28, 2011. *Id.* The ALJ determined that Plaintiff had the following severe impairments: vision disorder; "L4-L5 herniated disc and degenerative disc disease L5-S1"; history of open reduction internal fixation of the tibial fracture; chronic obstructive pulmonary disorder ("COPD") and/or asthma; borderline intellectual functioning; anxiety; and panic disorder. *Id.* Following the determination of Plaintiff's severe impairments, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1. *Id.* at 21.

After considering the record, the ALJ found that, from December 28, 2011 to November 21, 2013, Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following additional limitations: sitting, standing, or walking for thirty minutes at a time; standing or walking for a total of four hours in a workday; sitting for a total of six hours in a workday; no climbing ladders "and the like"; no balancing on one lower extremity at a time; occasional stooping or crouching; no crawling; occasional exposure to respiratory irritants; no

exposure to obvious hazards, including moving mechanical parts or machinery that could cause bodily injury; no work in high, exposed places; work tasks that did not involve the visual ability to perform precise tasks requiring fine detail; no tasks requiring depth perception that could not be accommodated by the individual turning their body; and no reading for extended periods of time. Tr. at 23.  The ALJ also determined that Plaintiff could: understand, carry out, and remember simple instructions where the pace and productivity were not dictated by an external source over which Plaintiff had no control, such as an assembly line or conveyor belt; make judgments on simple work and respond appropriately to usual work situations and changes in a routine work setting that was repetitive from day to day with few, expected changes; and respond appropriately to supervisors and co-workers, and occasionally the general public.  *Id.* at 23-24.  Further, the ALJ noted that Plaintiff was limited to work where reading, writing, and math were not important.  *Id.* at 24.

Continuing, the ALJ stated that, after consideration of the record, beginning on November 22, 2013, Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following additional limitations: sitting, standing, or walking for thirty minutes at a time; standing or walking for a total of four hours in a workday; sitting for a total of six hours in a workday; no climbing ladders "and the like"; no balancing on one lower extremity at a time; occasional stooping or crouching; no crawling; occasional exposure to respiratory irritants; no exposure to obvious hazards, including moving mechanical parts or machinery that could cause bodily injury; no work in high, exposed places; work tasks that did not involve the visual ability to perform precise tasks requiring fine detail; no tasks requiring depth perception that could not be accommodated by the individual turning their body; no reading for extended periods of time; and use of a cane to walk beyond the work station.  Tr. at 31.  The ALJ also determined that Plaintiff could: understand, carry out, and remember simple instructions where the pace and productivity were not dictated by an external source over which Plaintiff had no control, such as an assembly line or conveyor belt; make judgments on simple work and respond appropriately to usual work situations and changes in a routine work setting that was repetitive from day to day with few, expected changes; and respond appropriately to supervisors and co-workers, and occasionally the

general public.  *Id.*  Further, the ALJ noted that Plaintiff was limited to work where reading, writing, and math were not important.  *Id.*

Next, the ALJ determined that Plaintiff was unable to perform any past relevant work.  Tr. at 32.  The ALJ stated that Plaintiff was a younger individual on the alleged disability onset date, had a limited education and was able to communicate in English, and that the transferability of job skills was not an issue because Plaintiff's past relevant work was unskilled.  *Id.*  Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed from December 28, 2011, to November 21, 2013.  *Id.* at 33.  Continuing, the ALJ determined that beginning November 22, 2013, and considering  Plaintiff's age, education, work experience, and RFC, the ALJ determined there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.  *Id.* at 34.  In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from October 26, 2011, through the date of the decision.  *Id.* at 35.  At issue is the decision of the ALJ dated June 5, 2014, which stands as the final decision.

On December 23, 2015, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1.  Plaintiff filed a brief on the merits on April 1, 2016, asserting that the ALJ erred because she: (1) did not provide good reasons for rejecting the most severe impairments contained in the opinion offered by one physician; and (2) failed to develop the record with respect to Plaintiff's intellectual impairments.  ECF Dkt. #16 at 6-16.  On June 13, 2016, Defendant filed a response brief.  ECF Dkt. #19.  Plaintiff did not file a reply brief.

## II.     SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

After finding that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2015, the ALJ determined that he had not engaged in substantial gainful activity since December 28, 2011, the alleged onset date.  Tr. at 20.  The ALJ found that Plaintiff had severe impairments, as stated above, and indicated that she considered Listing 1.04 (disorders of the spine), Listing 1.06 (fracture of the femur, tibia, pelvis, or one or more of the tarsal bones), Listing 2.02 (loss of visual acuity), Listing 3.02 (chronic pulmonary insufficiency), Listing 3.03 (asthma), and

the Listings found under § 12.00 (mental disorders). *Id.* at 21. Additionally, the ALJ indicated that she considered the "paragraph B" criteria of the applicable Listings ("paragraph D" criteria for Listing 12.05). *Id.* In examining Plaintiff's activities of daily living, the ALJ found that Plaintiff had no restriction. *Id.* The ALJ noted that Plaintiff's activities of daily living included adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, appropriate grooming and hygiene, using telephones and directories, and using a post office. *Id.* Continuing, the ALJ found no limitations because, while Plaintiff reported difficulties in the performance of routine activities of daily living, his problems appeared to be premised on his physical complaints, rather than his mental symptoms. *Id.* Additionally, the ALJ indicated that Plaintiff was able to manage his finances, shop at the grocery store, prepare complete meals, and needed no reminders to tend to his personal needs, grooming, or take his medications. *Id.*

In social functioning, the ALJ found that Plaintiff had no difficulties. Tr. at 21. The ALJ noted that Plaintiff denied any problems interacting with family, friends, neighbors, authority figures, or others in the Adult Function Report prepared in July 2012, and reported that he "got along great" with authority figures. *Id.* at 22. Continuing, the ALJ stated that Plaintiff testified that he "got along with people," and although he liked his own space, he sometimes went to the grocery store with his girlfriend. *Id.* The ALJ indicated that Plaintiff had been able to navigate personal relationships, as evidenced by his two-year relationship with his girlfriend. *Id.* According to the ALJ, the record supported a finding that Plaintiff was not limited in social functioning, and that this change from the previous ALJ's finding of only mild limitations was based on evidence of improvement, including Plaintiff's hearing testimony. *Id.*

With regard to concentration, persistence, or pace, the ALJ found that Plaintiff had moderate difficulties because he was observed to have problems with his short-term memory and appeared to function in the low-average range intellectually during a psychological consultative evaluation with Neil Shamberg, Ph.D., in July 2012. Tr. at 22. The ALJ noted that Dr. Shamberg also indicated that Plaintiff was well oriented in all four usual spheres and that his thought process was usually logical, coherent, and goal-directed. *Id.* Continuing, the ALJ cited the July 2012 Adult Function Report, in which it was reported that Plaintiff stated that he was capable of paying attention

for a long time, he was great at following both spoken and written instructions, and that he finished what he started.  *Id.*  Additionally, the ALJ indicated that Plaintiff's treating physicians had consistently observed that he was alert and oriented.  *Id.*  For these reasons, the ALJ stated that the evidence supported a finding that Plaintiff had no more than moderate limitations in concentration, persistence, or pace.  *Id.*

As for episodes of decompensation, the ALJ found that Plaintiff had experienced no episodes of decompensation of extended duration.  Tr. at 22.  The ALJ stated that Plaintiff's mental impairments did not satisfy the "paragraph B" criteria of any applicable Listing because the impairments did not cause at least two marked limitations, or one marked limitation and repeated episodes of decompensation, each of extended duration.  *Id.*  Continuing, the ALJ indicated that the evidence failed to establish that the "paragraph C" criteria were satisfied.  *Id.*

The ALJ then explained the RFC finding for the period of December 28, 2011, to November 21, 2013, as described above.  Tr. at 23.  According to the ALJ, Plaintiff originally reported that he was disabled as the result of his lazy eye, blindness in one eye, and back problems.  *Id.* at 24.  The ALJ indicated that Plaintiff subsequently reported that his condition had continued to deteriorate, impacting his activities of daily living and ability to care for his personal needs.  *Id.*  Continuing, the ALJ stated that Plaintiff testified at the hearing that he lived with his girlfriend of over two years and three children, adding that his girlfriend was receiving disability for her intellectual impairments.  *Id.*  The ALJ indicated that Plaintiff testified that he was prevented from working due to his back, legs, and inability to read and write.  *Id.*  Next, the ALJ stated that he was unable to read a newspaper, although he could read a grocery list, and that he tried to work as a babysitter, but was unable to continue because of his physical problems, including the inability to lift a child that was one-and-a-half years old.  *Id.*

The ALJ then stated that Plaintiff testified that he used a walker, although it was not prescribed, and sometimes used a cane that was prescribed by his doctor.  Tr. at 24.  Continuing, the ALJ indicated that Plaintiff testified that he sat down to perform chores, such as cooking, washing the dishes, mopping, and sweeping due to pain in his legs.  *Id.*  The ALJ stated that Plaintiff testified that he was blind in one eye, that glasses only help a little bit, and that he had breathing problems

-6-

from dust and heat.  *Id.*  According to the ALJ, Plaintiff indicated that his typical day included: cleaning; watching his child, who was still in diapers; playing video games; and building model cars. *Id.*  With respect to Plaintiff's physical capabilities, the ALJ stated that Plaintiff testified that he was capable of walking about twenty minutes using his cane, standing about ten minutes, sitting for ten or twenty minutes, and lifting ten pounds.  *Id.*

The ALJ indicated that, after careful consideration of the evidence, Plaintiff's mentally determinable impairments could reasonably be expected to cause some of the alleged symptoms, however, his comments concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible.  Tr. at 25.  In particular, the ALJ stated that while Plaintiff alleged a high degree of limitation, the objective medical evidence did not support the severity of Plaintiff's symptoms as described.  *Id.*  The ALJ stated that the record did reveal a longstanding history of complaints of low back pain and asthma, as well as a history of open treatment of the tibial shaft fracture with a plate and screws.  *Id.*  Next, the ALJ indicated that a November 2011 x-ray of Plaintiff's lumbar spine showed moderate degenerative disc disease and mild to moderate spondylosis at L5-S1, along with mild narrowing at L4-L5 indicating degenerative disc disease.  *Id.* Continuing, the ALJ noted that a subsequent MRI of Plaintiff's lumbar spine exhibited mild narrowing of the spinal canal and mild narrowing of the neural foramina bilaterally at L4-L5 and L5-S1, but that a July 2013 CT scan of the lumbar spine showed severe disc narrowing at L4-L5 and L5-S1.  *Id.*

The ALJ stated that Plaintiff's treatment records failed to reveal significant clinical abnormalities upon physical examination to account for his allegedly severe subjective complaints. Tr. at 25.  As an example, the ALJ indicated that while Plaintiff reported a history of asthma and treatment records indicated that he had COPD, physical examinations continually demonstrated that Plaintiff had a normal respiratory rate and rhythm with clear bilateral breath sounds and no respiratory distress.  *Id.*  The ALJ also noted that a March 2012 neurosurgery examination revealed that Plaintiff had full motor strength, intact sensation to light touch, normal gait and stance, and normal sensation to pinpricks despite tenderness in the lumbar region.  *Id.*  Continuing, the ALJ stated that although Plaintiff complained of pain going down the back of his leg at an emergency

-7-

room visit in July 2012, he was capable of straight leg raises to ninety degrees upon examination, and, moreover, an August 2012 wellness examination showed that Plaintiff had normal muscle strength and tone, and normal coordination.  *Id.*  According to the ALJ, in July 2013 Plaintiff visited an emergency room for back pain and it was determined that he had low back pain with flexion and extension, but no radicular pain and intact neurological findings, and that Plaintiff was able to walk on his toes and heels.  *Id.*

The ALJ indicated that Plaintiff had difficulty ambulating due to musculoskeletal pain on the lumbar spine at an emergency room visit in July 2013 after undergoing chiropractic care.  Tr. at 25.  According to the ALJ, it appeared that the abilities displayed during the July 2013 emergency room visit were due to temporary exacerbation of Plaintiff's symptoms since subsequent examinations through the end of September 2013 showed that he had a normal gait with range of motion and strength within normal limits in the bilateral lower extremities, except in his hip flexors. *Id.*  Additionally, the ALJ noted that during a physical therapy assessment in September 2013, the occupational therapist, Tricia Barton, reported that although Plaintiff indicated that he was unable to walk in his pain questionnaire; however, Plaintiff walked 400 feet during the evaluation while conversing with Ms. Barton.  *Id.*  Additionally, the ALJ stated that Plaintiff's primary care physician remarked that he was unwilling to say that Plaintiff was permanently unable to work when he requested a note for job and family services so he would not be required to pay child support.  *Id.*

Concerning Plaintiff's allegations regarding his vision, the ALJ indicated that the previous ALJ noted in his decision that Plaintiff retained visual acuity of 20/30 in his right eye and 20/20 in his left eye.  Tr. at 26.  The ALJ stated that since the previous ALJ's decision, no new ophthalmology records were available and Plaintiff indicated that he had no idea when he last sought treatment for his alleged visual impairments.  *Id.*  According to the ALJ, the medical record reflected that Plaintiff failed to even mention this alleged impairment throughout the record when asked about his past medical problems or symptoms, and that physical examinations showed no abnormalities with regard to Plaintiff's eyes.  *Id.*

Based on the above, the ALJ stated that she considered the state agency medical consultants' medical assessments, which adopted the physical RFC limitations in the prior ALJ's decision, and

afforded the assessments great weight since they appeared reasonable given Plaintiff's history of asthma, open treatment of the tibial shaft fracture with a plate and screws, visual difficulties, and COPD, despite the little, if any, abnormalities observed upon physical examination with regard to Plaintiff's respiratory, lower extremity, and visual functioning throughout the relevant period. Tr. at 26. The ALJ also noted that the medical assessments appeared to be consistent with the findings of functional capacity assessment performed in September 2013 by Ms. Barton, and demonstrated that Plaintiff's range of motion and strength was normal in the lower and bilateral extremities except his bilateral hip flexors, which had slightly diminished strength. *Id.*

Concerning the remark by Plaintiff's family physician, R. Karen Reiter, M.D., that he was unwilling to say that Plaintiff was permanently unable to work, the ALJ noted that the remark was not a function-by-function assessment and that it provided little insight into helping determine Plaintiff's abilities. Tr. at 26-27. Similarly, the ALJ raised the observations of Ms. Barton relating to the functional capacity assessment, and then indicated that both opinions were afforded some weight since both Dr. Reiter and Ms. Barton had the opportunity meet and question Plaintiff. *Id.* at 27. The ALJ indicated that she afforded little weight to the restrictions provided as part of Plaintiff's discharge from the emergency room since the restrictions appeared to be standard instructions accorded to every person allegedly experiencing chronic back pain, rather than in response to Plaintiff's actual limiations. *Id.* Based upon the objective evidence, opinions, and Plaintiff's subjective complaints, as described above, the ALJ determined that the RFC finding provided that Plaintiff was capable of work at the light exertional level with additional limitations, as provided above. *Id.*

Regarding Plaintiff's mental health symptoms, the ALJ indicated that Plaintiff presented to Dr. Shamberg in July 2012 as flat and depressed, and at times displaying severely pressured speech. Tr. at 27. The ALJ noted that Dr. Shamberg also indicated that Plaintiff was always polite, deferential, and cooperative, and usually with a logical, coherent, and goal-oriented thought process. *Id.* Continuing, the ALJ stated that Plaintiff manifested no signs of anxiety, such as fidgeting or trembling. *Id.* The ALJ also indicated that although Dr. Reiter noted pressured speech and racing thoughts in August 2012, he stated that Plaintiff's mood and affect were normal in October 2013.

*Id.*  Similarly, the ALJ noted that Plaintiff's pain management treatment record routinely showed that his mood, affect, and behavior were normal, and that Plaintiff also testified that he worked as a babysitter for all of 2012 and some of 2013, which could be quite demanding emotionally as well as physically.  *Id.*

Further, the ALJ stated that despite Plaintiff's borderline intellectual functioning, he reported activities of daily living that evidenced a higher level of communication, understanding, and functional ability than what he alleged in connection with his claims of disabling impairments.  Tr. at 27.  As an example, the ALJ indicated that Plaintiff was capable of managing his finances, shopping at the grocery store, and preparing complete meals.  *Id.*  Further, the ALJ stated that Plaintiff: needed no special reminders to tend to his personal needs, groom himself, or take his medications; was able to read a grocery list; could add and subtract; and understood why individuals should pay taxes and why child labor laws were necessary.  *Id.* at 27-28.

For these reasons, the ALJ afforded little weight to the portion of Dr. Shamberg's opinion regarding Plaintiff's ability to respond appropriately to supervisors, most co-workers, and most work pressures in all work settings.  Tr. at 28.  The ALJ indicated that Dr. Shamberg opined that Plaintiff would have moderate to severe limitations responding to supervisors and most co-workers, and fairly severe limitations with respect to his ability to respond appropriately to most work pressures in all work settings, as well as keeping pace and persistence at job tasks.  *Id.*  To support her determination that this portion of Dr. Shamberg's opinion deserved little weight, the ALJ stated that Dr. Shamberg provided that Plaintiff was always polite, deferential, and cooperative, with a usually logical, goal-oriented thought process.  *Id.*  The ALJ also indicated that Dr. Shamberg reported that Plaintiff did not manifest signs of anxiety, such as fidgeting or trembling.  *Id.*  Accordingly, the ALJ determined that Dr. Shamberg relied on the subjective reports of symptoms and limitations provided by Plaintiff, and seemed to uncritically accept as true most, if not all, of what Plaintiff reported since the above observations did not appear to support Dr. Shamberg's contentions regarding Plaintiff's ability to "get along" with others, keep pace and persistence, and handle work pressures.  *Id.*
 Additionally, the ALJ noted that Plaintiff's work as a babysitter during the whole of 2012, which

-10-

could be quite demanding emotionally and physically, did not support the limitations opined by Dr. Shamberg.  *Id.*

Continuing, the ALJ indicated that she afforded great weight to the portion of Dr. Shamberg's opinion regarding Plaintiff's ability to understand, remember, carry out job instructions, and maintain attention and concentration.  Tr. at 28.  The ALJ stated that Dr. Shamberg's assessment appeared reasonable given Plaintiff's activities of daily living, which showed he was able to manage his finances, shop at the grocery store, babysit children, and prepare complete meals, as well as his ability to tend to his personal needs, groom himself, and take his medications without reminders. *Id.*  Further, the ALJ noted that this portion of Dr. Shamberg's opinion was consistent with his treatment history, which showed occasional anxiety, pressured speech, and racing thoughts, but also that Plaintiff regularly maintained a normal mood and affect, and exhibited appropriate behavior despite the above.  *Id.*  As for the global assessment of functioning ("GAF") score of forty-five assessed by Dr. Shamberg, the ALJ stated that a single GAF score presented only a "snapshot" assessment based on the day of the assessment, and that she considered the GAF score accordingly. Tr. at 28.

The ALJ also stated that she considered mental assessments prepared by state agency medical consultants providing that Plaintiff was capable of connecting simple tasks and some multi-step tasks in a static setting that did not require a sustained fast pace, which was away from the distraction of others and with only superficial interaction with others.  Tr. at 28.  Continuing, the ALJ stated that she afforded great weight to these assessments except with regard to working around others and interacting, as it was consistent with Plaintiff's treatment history, which showed that he occasionally exhibited anxiety, pressured speech, and racing thoughts, yet still maintained a normal mood and affect, and exhibited appropriate behavior despite his impairments.  *Id.* at 29.  The ALJ indicated that little weight was afforded to the medical assessments regarding Plaintiff's ability to interact and be around others because the assessments were inconsistent with Plaintiff's own statements in the record and testimony indicating that he had no problem "getting along" with family, friends, neighbors, authority figures, or others, despite "liking his own space."  *Id.*

-11-

Continuing, the ALJ indicated that the RFC finding took into consideration intermittent periods during which Plaintiff was anxious or depressed, and also considered his borderline intellectual functioning and his own statements regarding his abilities and activities of daily living. Tr. at 29.  The ALJ also stated that she considered Plaintiff's complaints, but did not find them fully credible to the extent the complaints were inconsistent with the RFC finding.  *Id.*  Additionally, the ALJ noted that when assessing Plaintiff's credibility she considered the factors relevant to assessing pain and other symptoms, including: Plaintiff's daily activities; the location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication, received for relief of pain or other symptoms; any measures used to relieve pain or other symptoms; and other factors concerning the functional limitations and restrictions due to pain or other symptoms.  *Id.* at 29-30.

The ALJ found that the degree of symptoms and limitations alleged by Plaintiff was not consistent with his treatment history or his functional ability, as reflected by his activities of daily living.  Tr. at 30.  As an example, the ALJ stated that Plaintiff's family physician, Dr. Reiter, noted a history of non-compliance with Plaintiff not fully understanding the importance of taking non-steroidal anti-inflammatory drugs on a daily basis and not maintaining his physical therapy routine in September 2013.  *Id.*  Additionally, the ALJ noted that Plaintiff never required psychiatric hospitalization, or undertook counseling or therapy for any mental complaint, indicating that his reported symptoms were not as severe as alleged.  *Id.*  The ALJ also looked to Ms. Barton's statements that it "appeared during testing that symptom magnification/pain behavior was a significant limiting factor for this test" and "based on [Plaintiff's] score on the pain questionnaires, he may perceive his pain to limit him more than what it actually does."  *Id.*  Continuing, the ALJ stated that while such behavior may not be the result of a conscious intent to mislead, it did suggest that the information provided by Plaintiff may not be entirely credible, especially in light of Dr. Reiter's refusal to say that he was permanently unable to work.  *Id.*

Further, the ALJ determined that although Plaintiff attempted to minimize his activities of daily living at the hearing, this degree of limitation was not supported by the record, which

-12-

suggested an attempt by Plaintiff to exaggerate the severity of his symptoms.  Tr. at 30.  As an example, the ALJ stated that Plaintiff reported that he was capable of managing his finances, shopping at the grocery store, and preparing complete meals, as well as indicating that he did not need special reminders to tend to his personal needs, groom himself, or take his medications.  *Id.* According to the ALJ, despite these reports contained in the record, Plaintiff testified that his intellectually disabled girlfriend paid the bills and reminded him to take his medications.  *Id.* Additionally, the  ALJ stated that Plaintiff testified that he sat down when performing household chores, including cooking, washing dishes, mopping, and sweeping, which seemed almost improbable based on the amount of movement required to perform such chores.  *Id.*  Further, the ALJ indicated that Plaintiff was able to work as a babysitter after his alleged disability onset date in 2012 and 2013, and that this job could by quite demanding both physically and emotionally.  *Id.* Based on the above, the ALJ determined that although Plaintiff's work activity did not constitute disqualifying substantial gainful activity, it did indicate that his daily activities have, at least at times, been somewhat greater than he had generally reported. *Id.*

Next, the ALJ explained the RFC finding for the period beginning November 22, 2013, as described above. Tr. at 31.  Specifically, the ALJ indicated that although treatment records revealed that Plaintiff displayed a normal respiratory rate and rhythm with clear bilateral sounds, no respiratory distress, normal mood, normal affect, and normal behavior, his pain management doctor prescribed a cane on November 22, 2013.  *Id.*  The ALJ noted that, thereafter, Plaintiff had an antalgic gait requiring ambulation with a cane due to decreased range of motion, tenderness, and pain in his lumbar spine and bilateral hips.  *Id.*  Continuing, the ALJ stated that an MRI of Plaintiff's lumbar spine, taken in March 2014, demonstrated little, if any, change compared to the MRI taken in July 2013, as it still showed relatively mild and minor findings of central disc protrusion at L4-L5 along with other mild and minor changes.  *Id.*  The ALJ indicated that an x-ray of Plaintiff's bilateral hips and pelvis showed normal bone density, an intact and symmetric pelvis, unremarkable sacrum and SI joints, normal and symmetric hips, no fracture or dislocation, and unremarkable soft tissue. *Id.*

-13-

To reflect the above findings, the ALJ adjusted the RFC finding, determining that beginning November 22, 2013, Plaintiff's RFC included the ability to use a cane to walk beyond his workstation in additional to the limitations previously assessed. Tr. at 31.  The ALJ indicated that she gave great weight to the opinion of Plaintiff's pain management doctor, Nicole Morris, M.D., insofar as Dr. Norris opined that Plaintiff needed an assistant device for ambulation because it was consistent with the treatment record. *Id.* at 32.  Continuing, the ALJ stated that she gave little weight to Dr. Norris' opinion that Plaintiff: could lift and carry less than ten pounds frequently; could stand and walk two hours in an eight-hour workday with no sitting, standing, or walking for more than ten minutes at a time; was unable to twist, stoop, crouch, or climb stairs; needed to lie down at unpredictable intervals every hour; and would miss more than four days per month. *Id.*  Specifically, the ALJ indicated that Dr. Norris' findings appeared inconsistent with her treatment records, which failed to reveal the type of significant clinical abnormalities that would be expected if Plaintiff was as limited as Dr. Norris opined. *Id.*  According to the ALJ, it appeared that Dr. Norris relied heavily on Plaintiff's subjective reports, and seemed to accept most, if not all, of his reports as true, yet there were good reasons to question the reliability of Plaintiff's subjective complaints. *Id.*

Next, the ALJ determined that Plaintiff was unable to perform any past relevant work.  Tr. at 33.  The ALJ found that Plaintiff was a younger individual on the alleged disability onset date, had a limited education and was able to communicate in English, and that the transferability of job skills was not an issue because Plaintiff's past relevant work was unskilled. *Id.*  Continuing, the ALJ found that from December 28, 2011, to November 21, 2013, and considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. *Id.*  Additionally, the ALJ determined that beginning November 22, 2013, and considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. *Id.* at 34.  Finally, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from October 26, 2011, through the date of the decision. *Id.* at 35.

### III.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

## V.     LAW AND ANALYSIS

### A.     First Assignment of Error

For his first assignment of error, Plaintiff asserts:

> The ALJ did not provide "Good Reasons" for rejecting the most severe limitations contained in Dr. Shamberg's opinion, which were supported by the non-examining reviewers and uncontradicted by any examining sources.

ECF Dkt. #16 at 6. Plaintiff claims that the ALJ did not acknowledge or discuss the fact that the significant social limitations contained in Dr. Shamberg's opinion supported the opinions of the state agency non-examining experts, namely, that Plaintiff should be limited to superficial contact with others and away from the distraction of others. *Id.* at 8.  In support of this position, Plaintiff asserts that "the ALJ rejected the social limitations of the non-examining reviewers asserting that they were inconsistent with the observations of Dr. Shamberg without acknowledging that Dr. Shamberg also concluded that [Plaintiff] was severely limited in social functioning." *Id.*

Plaintiff next avers that the ALJ gave great weight to parts of Dr. Shamberg's opinion while concurrently affording little weight to the most significant and limiting parts of the opinion, and that the ALJ's rejection of significant assessed limitations was error. ECF Dkt. #16 at 8.  First, Plaintiff

-16-

claims that the ALJ's interpretation of his daily activities relied on a highly selective reading of the record.  *Id.*  To support this point, Plaintiff cites to a number of places in the hearing transcript, the July 2012 Adult Function Report completed by Plaintiff, and a recitation of Plaintiff's statements regarding his activities of daily living contained in Dr. Shamberg's opinion.  *Id.* (citing Tr. at 48, 61, 64, 344-46, 485).

Next, Plaintiff claims that it was improper for the ALJ to assume Dr. Shamberg was not able to sort through the objective and subjective evidence when assessing the weight to afford Dr. Shamberg's opinion.  ECF Dkt. #16 at 10.  Plaintiff also claims that Dr. Shamberg explicitly stated that Plaintiff's reports had good internal consistency and that there was "close correspondence" between Plaintiff's reports and the collateral data.  *Id.* at 11.  Continuing, Plaintiff asserts that the ALJ's comments regarding Plaintiff's ability to babysit were entirely speculative, and if the ALJ used this "attempt at work" in her analysis it was critical to know precisely how and to what level the babysitting was performed.  *Id.*  In sum, Plaintiff claims that the ALJ rejected expert medical evidence and substituted her lay analysis, and, as such, the ALJ's decision was not supported by substantial evidence.  *Id.* at 11-12.

Defendant contends that the ALJ properly evaluated the medical opinions of record, first noting that Dr. Shamberg was a non-treating source since he only examined Plaintiff on one occasion and did not have an ongoing relationship with him.  ECF Dkt. #19 at 8.  Before turning to the specifics of Plaintiff's argument, Defendant properly identifies three errors made by Plaintiff in his brief on the merits.  *Id.* at 8-11.  First, the Court agrees that Plaintiff is incorrect in claiming that the ALJ had to provide "good reasons" for the weight given to Dr. Shamberg's opinion.  Plaintiff is relying on the treating physician rule, despite the fact that no treating relationship was established with Dr. Shamberg.[3]

---

[3]Dr. Shamberg was a consultative examiner, not a treating source.  *See* Tr. at 28, 483.  The Court recognizes that 20 C.F.R. § 404.1519h indicates that a claimant's treating source is generally the preferred source for the purchased consultative examination, however, there is no evidence suggesting Dr. Shamberg was treating Plaintiff as the record contained a single opinion prepared by Dr. Shamberg based on a referral by the Ohio Division of Disability Determination.  *See* Tr. at 483.  Further, Plaintiff only cites to Dr. Shamberg's sole opinion and makes no attempt to establish that a treating relationship existed.  *See* ECF Dkt. #16.

The treating physician rule dictates that an ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. Social Security Rule ("SSR") 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore "be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544). Plaintiff has not established a treating relationship with Dr. Shamberg, instead, as discussed below, routinely referring to him as an examining psychologist, and thus the procedural requirement of providing "good reasons" to discount or reject an opinion does not apply to the ALJ's evaluation of Dr. Shamberg's opinion.

Second, the Court agrees with Defendant that Plaintiff's repeated claims that Dr. Shamberg was an expert in evaluating Social Security disability claims, even indicating that Dr. Shamberg was "the Agency's own examining expert," is simply incorrect. See ECF Dkt. #16 at 4, 7, 8, 11. Plaintiff has mistaken Dr. Shamberg for a state agency medical or psychological consultant, as evidenced by his citation to 20 C.F.R. § 404.1527(e). *See* Tr. at 7. A review of the record reveals that Dr. Shamberg is instead a consultative examiner whose qualifications must only include being licensed in the state and have the training and expertise to perform the type of evaluation or test requested by the Social Security Administration. *See* 20 C.F.R. § 404.1519g. Contrary to Plaintiff's

claim that Dr. Shamberg is an expert in the field of Social Security disability claims, there is nothing in the record to suggest that Dr. Shamberg was specially qualified to conduct Plaintiff's evaluation.

Third, Defendant correctly states that the Sixth Circuit has not endorsed Plaintiff's claim that the ALJ must explain how every aspect of a medical opinion was weighed and resolved. *See* ECF Dkt. #16 at 6-7.  The full portion of Social Security Rule 96-8p quoted by Plaintiff reads, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain."  As discussed below, the ALJ complied with this procedural requirement.  Insofar as Plaintiff discusses a greater duty on the part of the ALJ to "accept and include, or reject and explain," he is relying on Dr. Shamberg being Plaintiff's treating physician, which, as discussed above, is not the case.  In sum, Plaintiff relies heavily on the treating physician rule, while simultaneously, albeit mistakenly, indicating that Dr. Shamberg was an examining psychologist with special training to handle Social Security disability claims, rather than a treating source.  To be clear, Plaintiff was referred to Dr. Shamberg, an independent consultative examiner, by the Ohio Division of Disability Determination ("ODDD") for a single psychological evaluation relating to his Social Security claim for mental disability benefits.[4]  Tr. at 483.

Turning to Plaintiff's arguments themselves, the Court finds that each argument is without merit.  First, Plaintiff claims that the ALJ did not acknowledge or discuss the fact that the significant social limitations contained in Dr. Shamberg's opinion supported the opinions of the state agency non-examining experts, namely, that Plaintiff should be limited to superficial contact with others and away from the distraction of others.  ECF Dkt. #16 at 8.  Plaintiff's claim that "the ALJ rejected the social limitations of the non-examining reviewers asserting that they were inconsistent with the observations of Dr. Shamberg without acknowledging that Dr. Shamberg also concluded that [Plaintiff] was severely limited in social functioning" is misplaced because, while Dr. Shamberg

---

[4]*See* How DDD Serves Ohioans with Disabilities, http://www.ood.ohio.gov/Core-Services/DDD (last visited February 2, 2017); The Division of Disability Determination Social Security Disability Claim Process, http://www.ood.ohio.gov/Portals/0/DDD%20Documents/Disability%20Claims%20Process_OOD.pdf (last visited February 2, 2017).

determined that Plaintiff was severely limited in social functioning, the non-examining reviewers did not. Tr. at 87, 101, 488. The non-examining reviewers found that Plaintiff was moderately limited in only some areas of social interaction and that he could only superficially relate to others. *Id.* at 87, 101. Dr. Shamberg found moderate to severe limitations in Plaintiff's ability to respond appropriately to supervisors and co-workers in a work setting, and fairly severe limitations regarding his ability to respond appropriately to most work pressures. *Id.* at 488. Accordingly, Plaintiff's claim that the ALJ erred by failing to discuss how the non-examining reviewers' opinions supported Dr. Shamberg's opinion is without merit because the non-examining reviewers' opinions did not, in fact, support Dr. Shamberg's opinion.

Next, Plaintiff avers that the ALJ gave great weight to parts of Dr. Shamberg's opinion while concurrently affording little weight to the most significant and limiting parts of the opinion, and that the ALJ's rejection of significant assessed limitations was error. ECF Dkt. #16 at 8. However, in support of this position, Plaintiff only cites to his own hearing testimony, the July 2012 Adult Function report that he completed, and a recitation of his own statement regarding one of his activities of daily living, not attending church, contained in Dr. Shamberg's opinion. *Id.* (citing Tr. at 48, 61, 64, 344-46, 485). While accusing the ALJ of a selective reading of the record, Plaintiff simultaneously cites multiple pieces of his own testimony and statements made after his claims were filed, without citing a single piece of objective medical evidence or his own statements that were made prior to the filing of his disability claims in support of his position. *Id.* at 9.

In contrast, the ALJ discusses Plaintiff's activities of daily living at several places in the decision, citing medical evidence and Plaintiff's statements that were made regarding his activities prior to filing these claims. Tr. at 21-22, 28, 30. The ALJ accurately described Plaintiff's attempt to minimize his daily activities at the hearing, describing how Plaintiff previously reported that he was capable of managing his finances, shopping at the grocery store, preparing meals, and that he did not need special reminders to tend to his personal needs; yet, Plaintiff testified at the hearing that his intellectually disabled girlfriend paid the bills and reminded him to take his medications. *Id.* at 30. Further, the ALJ stated that Plaintiff testified that he sat down when performing a number of chores, and that this seemed improbable based on the amount of movement required to perform

those chores.  *Id.*  Further, the ALJ indicated that Plaintiff was able to work as a babysitter for over a year after the alleged disability onset date.  *Id.*  It is clear from the ALJ's decision that the ALJ did not rely on a highly selective reading of the record as she cited numerous pieces of medical evidence and Plaintiff's own statements regarding his daily activities, and noted the numerous inconsistencies between the medical record and Plaintiff's testimony given at the hearing.

Plaintiff also claims that the ALJ should not have challenged Dr. Shamberg's opinion since it appeared to rely on subjective reports, and that there was no basis in the record to assume that Dr. Shamberg was not able to sort through the subjective and objective evidence before arriving at his conclusions.  ECF Dkt. #16 at 10.  As an initial matter, Plaintiff appears to be operating under the incorrect belief that Dr. Shamberg had access to all of the objective medical evidence, and could thus issue a fully informed opinion not overly reliant on Plaintiff subjective complaints which, for the reasons stated above, have been shown to be less than credible.  Dr. Shamberg listed the sources of data and methods used when evaluating Plaintiff, which included: the July 2012 Adult Function Report; a photocopy of the contract between the ODDD and Plaintiff; and a single neurosurgery note prepared by William Young, M.D.  Tr. at 483.  In fact, Dr. Shamberg stated, "most of the information provided came from [Plaintiff's] self reports."  *Id.*  Accordingly, the ALJ did not err in challenging Dr. Shamberg's opinion since it was based on Plaintiff's own reports, which have been shown to be less than credible.  Plaintiff also claims that the ALJ's consideration of his time working as a babysitter was too speculative because there was no indication that the work was performed competently.  ECF Dkt. #16 at 11.  However, Plaintiff babysit of over a year, and the only evidence cited by Plaintiff indicating that he had problems babysitting was a statement made during his hearing, and it has already been established that Plaintiff's hearing testimony was less than credible.  *See id.*

Finally, Plaintiff claims that the ALJ did not acknowledge that for a portion of the time under review he did not have health insurance and could not afford psychiatric treatment.  ECF Dkt. #16 at 10.  However, Plaintiff testified that he had health insurance, and even brought a large number of medications with him to the hearing.  Tr. at 49, 57-58.  Further, Plaintiff said that he was taking Zoloft at the time of his hearing, so it appears that he could afford some degree of psychiatric

-21-

treatment. *Id.* at 55.  In any event, Plaintiff cites no law to establish that the ALJ somehow erred by not acknowledging that Plaintiff did not have health insurance for a portion of the review period. For the above stated, reasons, the Court finds that the ALJ properly evaluated the opinions of record, and that Plaintiff's arguments are without merit.

### B.    Second Assignment of Error

For his second assignment of error, Plaintiff asserts:

The ALJ erred by failing to develop the record with respect to [Plaintiff's] obvious intellectual impairments.

ECF Dkt. #16 at 13.  Plaintiff claims that the ALJ failed to exercise his duty to develop the record as to material issues relating to his intellectual deficits. *Id.* at 14.  Namely, Plaintiff asserts that the ALJ should have ordered intelligence testing based on his established intellectual deficits, and because he believes he would qualify under Listing 12.05(C) had the ALJ ordered intelligence testing. *Id.*

Defendant asserts that Plaintiff has not identified any evidence that existed at the time of the hearing that was not in the medical record. ECF Dkt. #19 at 17-18.  Further, Defendant indicates that the ALJ's duty to develop the record primarily concerns the evidence that already exists, rather than generating new evidence that might assist Plaintiff's claim. *Id.* at 18 (citing 20 C.F.R. § 404.1512).  Additionally, Defendant argues that Plaintiff was represented by counsel at the ALJ hearing level and Plaintiff submitted a memorandum that made no mention of a need for IQ testing, and that Plaintiff's brief to the Appeals Council did not indicate that IQ testing was necessary. *Id.* at 18-19.  Finally, Defendant claims that the record did not suggest an intellectual disability. *Id.*

The Court agrees with Defendant.  The record does not support Plaintiff' contention that IQ testing would result in a finding that he is disabled.  Plaintiff did not attend special education classes, left school early to help support his family by working, rather than due to intellectual constraints, and engaged in work rising above the level of substantial gainful activity, holding the same job for fifteen years. Tr. at 329, 484.  There is no evidence in the record that Plaintiff's physicians thought that he should undergo intelligence testing.  Finally, Plaintiff had plenty of opportunities to ask the ALJ to order intelligence testing, yet never raised the issue until this stage of the case, despite being

represented by an attorney during the hearing and appeal to the Appeals Council.  The fact that Plaintiff has never requested intelligence testing belies his claims that the ALJ erred by not ordering intelligence testing on her own accord.  Plaintiff has failed to establish that the  ALJ failed to develop the record with respect to his alleged intellectual impairments.

**VI.**     **CONCLUSION**

For the following reasons, the Court AFFIRMS the decision of the ALJ and dismisses the instant case in its entirety with prejudice.


Date: February 7, 2017                 */s/George J. Limbert*
                                           GEORGE J. LIMBERT
                                           UNITED STATES MAGISTRATE JUDGE